

# THE ATTORNEY GENERAL
## OF TEXAS

### AUSTIN 11, TEXAS

JOHN BEN SHEPPERD
ATTORNEY GENERAL

*Overruled by*
*M-211 where*
*conflicts*

September 2, 1955

Dr. J. W. Edgar
Commissioner of Education
Texas Education Agency
Austin, Texas

Opinion No. S-171

Re: Constitutionality and con-
struction of Senate Bill
116, 54th Legislature (Ar-
ticle 2784e-1, V.C.S.) regu-
lating levy of taxes by
school districts for main-
tenance and bond purposes.

Dear Dr. Edgar:

Your letter requesting an opinion of this office assumes that
no action may be taken under Chapter 528, Acts of the 54th
Legislature, 1955 (Senate Bill 116) until the law becomes
effective. Your assumption is correct. The Senate concurred
in the House Amendments by a voice vote, thus making the bill
effective September 6, 1955, which is 90 days after adjourn-
ment.

Your questions are as follows:

"(1) Is Senate Bill No. 116 constitutional?

"(2) Will bonds voted prior to the effective
date of such statute, which bonds were
voted under statutes applicable at the
time of the election, including Article
2784e, continue to be limited by the 50¢
tax provision of Article 2784e, and if
your answer is in the affirmative, will
the 50¢ tax limitation apply to (a) bonds
outstanding on the effective date of Sen-
ate Bill No. 116, (b) bonds voted prior
to such effective date but not issued
until thereafter, and (c) bonds issued to
refund bonds voted prior to such effective
date?

"(3) Can a district lawfully elect to continue
to vote and levy maintenance taxes and

vote and issue bonds pursuant to Article 2784e, or will all maintenance tax and bond elections after the effective date of Senate Bill No. 116 automatically be held under the terms of said Senate Bill?

"(4) After the effective date of Senate Bill No. 116, may a district lawfully vote the maximum $1.50 maintenance tax provided by Senate Bill No. 116, even though at the time of the election it has in excess of 7.5% bonded indebtedness?

"(5) Once a district has lawfully voted maintenance taxes and bonds under Senate Bill No. 116, is there any means whereby the district can revert to its status prior to the election and thus be governed by the tax limitations imposed by Article 2784e?

"(6) If a district lawfully votes a maintenance tax in the maximum amount provided by Senate Bill No. 116, and if such district validly votes and issues bonds, the amount of which bonds when added to outstanding bonds is less than 10%, but because of a subsequent decrease in assessed valuations of taxable property in the year or years following the issuance of said bonds, the ratio is increased to 11%, is the maximum maintenance tax that the district may levy reduced to $1.10 on the one hundred dollars assessed value of taxable property within the district, or could the district under the statute levy a maintenance tax of $1.20. In other words, pursuant to the schedule set forth in Subdivision 1 of Section 1, will a school district which has validly come within the operation of the act always be able to levy a maintenance tax of at least $1.20 regardless of its outstanding bonded indebtedness (assuming, of course, that the tax in such amount has lawfully been voted and authorized)?"

Your first question is whether S. B. 116 is constitutional.

The amount of tax which may be levied by a school district is prescribed in Article 7, Section 3, of the Constitution of Texas in the following language:

> ". . . the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts heretofore formed or hereafter formed, for the further maintenance of public free schools, and for the erection and equipment of school buildings therein; provided that a majority of the qualified property taxpaying voters of the district voting at an election to be held for that purpose, shall vote such tax not to exceed in any one year one ($1.00) dollar on the one hundred dollars valuation of the property subject to taxation in such district, but the limitation upon the amount of school district tax herein authorized shall not apply to incorporated cities or towns constituting separate and independent school districts, nor to independent or common school districts created by general or special law."

As to whether a municipally controlled school district with extended boundaries comes within the above exception so as to permit the adoption of this Act is not now passed upon. As to all other districts specified, however, it is found that S.B. 116 properly prescribes the qualification of voters and manner of conducting the election for maintenance and bond purposes.

The only other questions which might arise are to be found in the language of Section 3 of the Act, which section reads as follows:

> "It is the intention of the Legislature that the provisions of this Act shall be cumulative of all other laws and it is further intended that the provisions hereof shall not apply to any district until such time as the provisions of this Act have been adopted by a majority

> vote of the qualified voters of such dis-
> trict who own property which has been duly
> rendered for taxation on the tax rolls of
> the county for that purpose."

The Supreme Court of Texas has previously ruled that the
Attorney General should approve bonds sought to be issued
by municipal and quasi-municipal corporations where the
law and his resultant duties are clear; otherwise, the pro-
posed issue should be disapproved since any question must
be resolved against the issuing agency.

Section 3 of Senate Bill 116 presents questions concerning
the sufficiency of the caption, proper qualifications of
voters, proper rolls for rendition purposes and the proper
interpretation of some of its language. While it is import-
ant that school finance not become stagnant, it is more im-
portant that no possibility exist that a school district
issue unlimited tax bonds when it has not complied with all
of the conditions precedent. Section 3, if constitutional,
requires the adoption of the provisions of the Act in order
for the district to have the power to issue unlimited tax
bonds.

The procedure hereinafter set out is cumbersome, and is rec-
ommended solely because it takes into account the possible
constructions of the provisions of Section 3 and thereby re-
moves any doubt as to the meaning of the Act. If this pro-
cedure is followed, the duty of the Attorney General will be
clear.

Three separate election orders should be entered calling an
election to determine if the district should adopt the provi-
sions of S.B. 116. The elections could be held at the same
time and place with the same election officials. Such election
orders, however, would vary as to the proper qualifications of
the voters as follows:

(1) Submission to the "qualified voters of such district
who own property which has been duly rendered for taxation on
the tax rolls of the county" as required by Section 3 of Sen-
ate Bill 116.

(2) Submission to the "qualified electors who own tax-
able property in the . . . district . . . and who have duly
rendered the same for taxation" on the district rolls, as

contemplated by Article 6, Section 3(a) and perhaps Article 7, Section 3, of the Constitution of Texas.

(3) Submission to the poll tax holders as contemplated by Article 6, Section 2, of the Constitution of Texas.

(As to common school districts, only methods 1 and 3 would be required in the light of Subsection 4 of Section 1 of S.B. 116).

If all of these propositions carry, there can be no question but that the district has lawfully adopted the provisions of the Act.

It would also be possible to enter still another election order (or as a part of number 2 above) to submit to the resident qualified property taxpaying voters who have duly rendered their property for taxation on the district rolls two additional propositions, i.e., the adoption of the maintenance tax provision as authorized by Subsection 1 of Section 1 of S.B. 116, and a proposition for the issuance of additional bonds under the unlimited tax provisions, as authorized by Section 1, Subsection 2 of S.B. 116. Of course, it would not be mandatory to vote additional bonds, but if the maintenance tax provisions of S.B. 116 are adopted, it necessarily follows that future issues of bonds must come under Subsection 2 of Section 1 as unlimited tax bonds.

It should be noted that Section 3 also speaks of a "majority vote of the qualified voters of such district" but in so doing does not specially provide for an election. Section 2, however, supplies this deficiency by saying that the general laws applicable to calling and holding bond and tax elections "shall govern such district in the calling and holding of <u>the election</u> permitted or required under this Act." Thus, all of the propositions may be submitted at a single election which should be called in the time and manner prescribed by Article 2785.

Your second question is whether the tax which may be levied for the payment of bonds voted prior to the effective date of Senate Bill 116 will be limited to 50¢ per one hundred dollars taxable valuation as provided by Article 2784e. It is an elemental principle of law that all statutes, decisions, and constitutional provisions which are in effect at the time of the issuance of the bonds form an integral part of the contract between the issuing agency and the bondholder. <u>Norton v. Tom</u>

Green County, 182 S.W. 2d 849, 851(Tex.Civ.App., 1944, writ ref.) cert. den. 325 U.S. 861, 65 S. Ct. 1200, 89 L. Ed. 1928; City of McAllen v. Daniel, 147 Tex. 62, 211 S.W. 2d 944,947 (1948); City of Houston v. Allred, 123 Tex. 334, 71 S.W. 2d 251,259 (1934); City of Aransas Pass v. Keeling, 112 Tex. 339, 247 S.W. 818 (1923).

It is equally well established that where the Constitution authorizes the levy of a special tax by the qualified property taxpaying voters, such tax is not levied by the school district or municipality but by the delegated taxing power of the owners of the property. Crabb v. Celeste Independent School District, 105 Tex. 194, 146 S.W. 528 (1912); San Saba County v. McCraw, 130 Tex. 54, 108 S.W. 2d 201 (1937), 64 C.J.S., p. 666.

In the Crabb case, supra, the court said (at page 530):

"It is safe and proper to say that no special tax authorized by the Constitution to be levied by the vote of the qualified property taxpaying paying voters of any municipality or school district can ever lawfully be levied without offering the opportunity to such property owners resident in such territory of exercising their privilege of the ballot."

In the San Saba case, supra, we find the following statement (at page 203):

"In the case at bar the qualified taxpaying voters of San Saba County voted under a law that secured to them the right to vote off such tax in two years, and, further, such voters voted under a law that guaranteed to them that the proceeds of such tax could never be charged with a bond issue. This law was passed for the purpose of putting into effect the constitutional provision authorizing such tax. Now, after such tax is voted, the Legislature, without the consent of the voters, has attempted to impair and destroy their rights existing at the time of the vote. To our minds such a legislative act not only violates the very constitutional provisions authorizing the tax to be voted, but violates section 16 of article 1 of our State Constitution as well." (Emphasis supplied)

The case of David v. Timon, 183 S.W. 88 (Tex.Civ.App., 1916) involved a situation where the law in existence at the time of the voting of certain bonds required that the bonds be sold at par and accrued interest. The statute was amended after the vote of the people but before the bonds were issued so as to permit the bonds to be sold at a discount. The court stated (at page 91):

> "There can be no doubt that the provision of law in effect when the bonds were voted was mandatory and binding upon every one concerned. It became a part of the contract for the issuance and sale of the bonds, and was a part of the consideration for the authorization of their issuance." (Emphasis supplied)

Thus, it is clear that in voting bonds prior to the effective date of Senate Bill 116, the resident qualified property taxpaying voters authorized the issuance of the bonds and that the 50¢ limitation contained in Article 2784e became a part of the contract which may not be changed without the express consent of the qualified property taxpaying voters who have duly rendered their property for taxation.

Another reason for answering your second question in the affirmative is found in the provisions of Senate Bill 116. Section 2 of the Act provides that the school district "may issue bonds and may levy ad valorem taxes . . .", clearly showing that the Act is prospective in operation only. The caption of the Act reads, in part:

> ". . . and providing that said districts may levy ad valorem taxes in an amount sufficient to pay the interest and principal of all bonds hereafter issued for such purpose . . ." (Emphasis supplied)

Thus, the caption and body of the bill conform as required by Article III, Section 35, of the Constitution of the State of Texas, and your second question is answered in the affirmative.

For the reasons above stated, the remainder of your questions are thus answered: Bonds voted under the provisions of

Article 2784e, whether issued or not, will be subject to the 50¢ tax limitation. There is no provision to permit the resident qualified property taxpaying voters to vote upon the issuance of refunding bonds under the unlimited tax statute, and for the reasons heretofore stated, bonds to refund limited tax obligations will necessarily be limited tax bonds. Article 2789 V.C.S. The power to issue refunding bonds is not implied, but must be obtained from the Legislature. San Antonio Union Junior College Dist. v. Daniel, 146 Tex. 241, 206 S.W. 2d 995 (1947).

As to your third and fifth questions, a reading of the entire Act clearly indicates that the Legislature contemplated that Senate Bill 116 and Article 2784e, Vernon's Civil Statutes, will be considered as alternative methods of securing school bonds which are voted after the effective date of the Act. Thus, the districts could choose not to accept the provisions of the new Act and vote and issue limited tax bonds, or it could adopt the provisions of Senate Bill 116 (assuming eligibility to do so by debt structure) and thereafter issue unlimited tax bonds. Once the district has adopted the provisions of Senate Bill 116, there is no provision for it to return to its former status under Article 2784e.

Your fourth question is whether the district may vote the maximum maintenance tax of $1.50 even though by reason of its debt structure the district would have authority to levy a tax of only $1.40, according to the formula contained in Section 1 of Senate Bill 116. Your question is answered in the affirmative. The Act of the Legislature contemplates the voting of a maintenance tax of not to exceed a certain amount and then restricts or limits the amount which may be levied in accordance with the formula which is based on the debt structure.

In addition to this interrelation and dependence of the maintenance tax upon the debt structure, it should be noted that Section 3 speaks of adopting "the provisions of this Act." Thus, it would not be possible to adopt the unlimited tax bond provisions without the adoption of the maintenance tax provisions under S.B. 116. The provisions limiting the number of maintenance tax elections (Article 2792) would not be applicable to the first maintenance tax election under S.B. 116 since the new statute confers a new and original authority. That restriction, however, thereafter would become applicable.

Your sixth question is as follows:

"If a district lawfully votes a maintenance tax
in the maximum amount provided by Senate Bill
No. 116, and if such district validly votes and
issues bonds, the amount of which bonds when
added to outstanding bonds is less than 10%,
but because of a subsequent decrease in assessed
valuations of taxable property in the year or
years following the issuance of said bonds, the
ratio is increased to 11%, is the maximum mainte-
nance tax that the district may levy reduced to
$1.10 on the one hundred dollars assessed value
of taxable property within the district, or could
the district under the statute levy a maintenance
tax of $1.20. In other words, pursuant to the
schedule set forth in Subdivision 1 of Section 1,
will a school district which has validly come
within the operation of the act always be able
to levy a maintenance tax of at least $1.20
regardless of its outstanding bonded indebtedness
(assuming, of course, that the tax in such amount
has lawfully been voted and authorized)?"

Section 1 of the Act reads, in part, as follows:

"In common and independent school districts,
rural high school districts, and cities and
towns constituting independent school districts,
and in all other school districts for the further
maintenance of public free schools, an annual ad
valorem tax may be levied not to exceed, in dis-
tricts having a bonded indebtedness of seven per
cent (7%) or less of its total assessed value of
taxable property, One Dollar and Fifty Cents
($1.50) on the One Hundred Dollars ($100.00)
assessed value of taxable property in the dis-
trict. For each one per cent (1%) or major
fraction thereof, increase in bonded indebted-
ness beyond seven per cent (7%) of the assessed
value of taxable property in such school district,
the maximum maintenance rate shall be decreased
by Ten Cents (10¢). The maximum maintenance
rates which may be levied annually in any district
shall conform to the following schedule:

Bonded indebtedness in the amount of
seven per cent (7%) or less of the
assessed value of taxable property   $1.50

Bonded indebtedness in the amount of
eight per cent (8%) of the assessed
value of taxable property   $1.40

Bonded indebtedness in the amount of
nine per cent (9%) of the assessed
value of taxable property   $1.30

Bonded indebtedness in the amount of
ten per cent (10%) of the assessed
value of taxable property   $1.20

. . ."  (Emphasis supplied).

All of the language of the Act must be given effect, and the underlined language demonstrates that an increase in the bonded debt must have a direct effect upon the amount of maintenance tax which may be levied. The next sentence does not modify or change the rule, but merely sets forth a schedule for purposes of illustration. This view is strengthened when it is remembered that the first sentence speaks of "fractions" of one per cent and the schedule makes no such allowances. Thus, if a district has a bonded debt of 9.9% of the assessed value of taxable property, but because of a decrease in the taxable values, the ratio becomes 11%, the maximum maintenance tax which could be levied would be $1.10 per one hundred dollars valuation.

## SUMMARY

The constitutional requirements of Article 7, Section 3, are met by the provisions of Senate Bill 116. Section 3 of that Act, however, is indefinite and uncertain in meaning, but the prescribed procedure will permit operation under the Act. The provisions of Senate Bill 116 are to be considered as an alternate method of school finance, but once this method is adopted, it must be followed for all purposes and there is no provision

to return to its former status.  The amount of tax which may be levied for maintenance purposes has a direct relation to the amount of bonds outstanding and may be less than $1.20 per one hundred dollars valuation.

Very truly yours,

JOHN BEN SHEPPERD
Attorney General

Elbert M. Morrow
                    Assistant

Frank Pinedo
                    Assistant

EMM-s